UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SORAYA FRANCES DE DANDRADE, MARIA
VASQUEZ, DAYSI MOYA, MARISOL OJEDA
DE NUNEZ, OBDULIA RUIZ, JUANA
JIMENEZ, EDUVIGIS A. DEL ROSARIO,
CHOU HANG, MIGUELINA DE LA CRUZ,
YOUTH MINISTRIES FOR PEACE AND
JUSTICE, and PROJECT CITIZENSHIP,

                              Plaintiffs,                        17-cv-9604 (PKC)

              -against-                                          OPINION
                                                                 AND ORDER

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, UNITED STATES
CITIZENSHIP AND IMMIGRATION
SERVICES, KIRSTJEN M. NIELSEN, Secretary
of the United States Department of Homeland
Security, and L. FRANCIS CISSNA, Director of
the United States Citizenship and Immigration
Services,

                              Defendants.
----------------------------------------------------------x

CASTEL, U.S.D.J.

              Lawful permanent residents ("LPRs") are required to pass an English language

exam and a civics exam before becoming citizens, unless the exam requirements are waived.  Nine

LPRs and two non-profit organizations filed this action seeking declaratory and injunctive relief

with respect to defendants' process for granting exam waivers based on mental or physical

conditions.  Plaintiffs allege violations of the Immigration and Nationality Act ("INA"), 8 U.S.C.

§ 1101 et seq., the Rehabilitation Act, 29 U.S.C. § 701 et seq., the Administrative Procedure Act

("APA"), 5 U.S.C. § 701 et seq., and the Due Process Clause of the Fifth Amendment of the U.S.

Constitution, U.S. Const. amend. V.  Defendants, the United States Department of Homeland

Security ("DHS"), the United States Citizenship and Immigration Services ("USCIS"), and directors of those agencies, now move to dismiss the complaint for lack of subject matter jurisdiction or for failure to state a claim upon which relief can be granted. For the reasons set forth below, the defendants' motion to dismiss will be granted.

BACKGROUND

The following facts are taken from the plaintiffs' Complaint and declarations submitted on behalf of both parties and are construed in the light most favorable to the plaintiffs.

I.     The Parties

At the time the Complaint was filed, in December 2017, all nine individual plaintiffs were LPRs, i.e. non-citizens who have been granted authorization to live and work in the United States on a permanent basis. (Compl. ¶1 & n.1; Doc 1.)  LPRs wishing to become naturalized citizens must pass civics and English language tests, subject to certain exceptions for physical or mental disability.  8 U.S.C. § 1423(a), (b).  All nine individual plaintiffs submitted at least one N-648 Medical Certification for Disability Exception waiver form to USCIS.  (Compl. ¶¶56, 77, 94, 105, 124, 132, 145, 155, 165.) USCIS denied plaintiffs' waivers.  (Compl. ¶¶58, 77, 96, 107, 126, 133, 147, 156, 167.)  It is undisputed that as of February 2019, all but two of the individual plaintiffs, Daysi Moya and Obdulia Ruiz, had their N-648 waivers approved as part of their naturalization applications.  (Letter of February 6, 2019 at 2; Doc 59, Declaration of Zoraida Gomez, Doc 71.)

Plaintiff Youth Ministries for Peace and Justice ("YMPJ") is a non-profit organization whose mission is to help the residents of South Bronx neighborhoods, including help with immigration services.  (Compl. ¶¶175−76.) From August 2015 to August 2017, YMPJ helped residents of these neighborhoods file 118 naturalization applications, eleven of which included N-

648 disability waiver requests. (Compl. ¶177.) YMPJ spends additional resources serving clients who require N-648 waivers based on their experience with the high chance of N-648 denial. For example, YMPJ sends a representative to naturalization interviews only for clients with an N-648 disability waiver request. (Compl. ¶180.)

Plaintiff Project Citizenship is a non-profit organization located in Massachusetts whose mission is to provide services for LPRs to become citizens. (Compl. ¶182.) Ten percent of the at least 14,000 individual naturalization applications Project Citizenship has helped file, or 1,400 applications, have included N-648 waiver requests. (Compl. ¶186.) Noticing a high rate of N-648 request denials, Project Citizenship began in August 2016 to send a representative to every naturalization interview in which the candidate filed an N-648 request. (Compl. ¶186.) When N-648 forms are denied, Project Citizenship works with physicians to add information to N-648 waivers, re-submits, and accompanies clients to subsequent naturalization interviews. (Compl. ¶187.)

Defendant DHS oversees the United States' immigration and naturalization processes. (Compl. ¶18.) Defendant USCIS is a government agency within DHS. (Compl. ¶19.) Kirstjen M. Nielsen is the Secretary of DHS, and L. Francis Cissna is the Director of USCIS. (Compl. ¶¶20−21.)

II.     The Allegations

Plaintiffs contend that defendants violated statutory and Constitutional requirements by failing to implement a fair and effective process for considering N-648 medical disability waiver requests. Specifically, plaintiffs contend that defendants deny waivers based on inappropriate considerations, refuse to explain the bases for their denials, substitute their own judgment for that of medical professionals when reviewing disability waiver requests, improperly

refuse to accept photocopied documentation, fail to review waivers prior to naturalization interviews, subject applicants to humiliation and emotional stress by requiring them to take the English and civics tests when they know applicants cannot pass, and fail to provide opportunities to challenge denials of N-648 requests. (Compl. ¶¶44−54, 191, 194, 203, 204, 206, 212, 217.)

LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth. Id. Instead, a court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. For the purposes of a motion to dismiss, the court must accept all factual allegations in the Complaint as true and draw all reasonable inferences in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff[s'] claims are barred as a matter of law.'" Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208−09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

A motion to dismiss under Rule 12(b)(1), Fed. R. Civ. P., is decided under the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). Lerner v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir. 2008) (Sotomayor, J.), abrogated on other grounds by Lexmark Int'l, Inv. v. Static Control Components, Inc., 572 U.S. 118, 126−27 (2014). However, "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a

district court may consider evidence outside the pleadings." Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008). Unlike a Rule 12(b)(6) motion, for which the movant bears the burden of proof, on Rule 12(b)(1) motions "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).

DISCUSSION

## I.     The Organizations Have Article III Standing

Defendants contest the Article III standing of YMPJ and Project Citizenship. "[A]n organization can 'have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'" N.Y. Civil Liberties Union v N.Y. City Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012) (quoting Warth v. Seldin, 422 U.S. 490, 511 (1975)).[1] To qualify, the organization "must meet the same standing test that applies to individuals." Id. (internal quotation marks omitted). Plaintiffs must show an injury-in-fact that is traceable to the harmful conduct complained of and capable of being redressed by a favorable court decision. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Injury may be shown by "injury to the organization's activities—with the consequent drain on the organization's resources." Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982). The Second Circuit has "repeatedly held that only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 110 (2d Cir. 2017) (internal quotation marks omitted); see Nnebe v. Daus, 644 F.3d 147, 156−57 (2d Cir. 2011) (impairment may be shown with "scant" evidence of "some perceptible opportunity cost expended").

---

[1] Plaintiffs do not argue that they satisfy the alternative means of showing organizational standing, where an organization "sue[s] on behalf of its members." N.Y. Civil Liberties Union, 684 F.3d at 294.

Project Citizenship and YMPJ have alleged sufficient details to demonstrate standing based on a diversion of resources.[2] YMPJ alleges that it employs a single representative responsible for immigration services, and that this representative spends twice as much time serving clients with N-648 forms than other clients due to the USCIS's allegedly discriminatory and arbitrary practices denying N-648 waivers. (Compl. ¶179.) Part of this extra expenditure of time is spent attending interviews for clients with N-648 forms, a service not offered to other immigration clients. (Compl. ¶179.) Project Citizenship alleges that it has had to divert resources to combat USCIS's unlawful practices in the form of sending an attorney to interviews for any client with an N-648 waiver request, and, because of the high rate of denials, attorneys must then expend more time attending and preparing for a second interview and N-648 waiver request. (Compl. ¶¶180, 186−87.)

There is a real world injury in diverting limited staff attorneys' time to attend client interviews and expend additional efforts preparing repeated applications for N-648 waivers. This "expenditure of resources . . . 'constitutes far more than simply a setback to [organizational plaintiffs'] abstract social interests.'" Nnebe, 644 F.3d at 157 (quoting Havens, 455 U.S. at 379). "[W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." Centro, 868 F.3d at 111. It is of no consequence that part of the diversion of resources is to preparing N-648 waivers and preparing clients for interviews, activities that are already part of the organization's usual services. "[T]he Second Circuit has held that an organization has

_____

[2] Generally if a court finds that one plaintiff has standing, it need not decide the standing of others. See Carey v. Population Servs. Int'l, 431 U.S. 678, 682 (1977); Centro, 868 F.3d at 109. Because the alleged injuries with respect to both organizational plaintiffs are nearly identical, the Court would apply the same analysis to either organizational plaintiff. The Court considers the standing of organizational plaintiffs because it determines infra that individual plaintiffs' claims must be dismissed.

standing where the defendant's conduct or policy interferes with or burdens an organization's ability to carry out its usual activities." Citizens for Responsibility and Ethics in Wash. v. Trump, 276 F. Supp. 3d 174, 190 (S.D.N.Y. 2017). For example, in Centro, the Second Circuit upheld organizational standing where the challenged conduct would force an organization to "divert money from its other current activities to advance its established organizational interests" and would make it "more costly" to carry out certain activities already part of its mission. 868 F.3d at 111; see, e.g., Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg, 290 F.R.D. 409, 417 (S.D.N.Y. 2012) (organizational standing found where advocacy organizations expended additional resources of the type they normally provided challenging alleged unlawful conduct).

Moreover, part of the burden on the organizations is diverting the time of their attorneys to attend naturalization interviews, a service that is outside their normal pattern of operations but which they allege is necessary to counteract and remedy the harmful consequences of defendants' unlawful conduct. (Compl. ¶¶179−80, 186−87.) Therefore, organizational plaintiffs have demonstrated that they have diverted resources from "regular tasks" to "identify and counteract" allegedly discriminatory practices, which is also sufficient to demonstrate injury-in-fact. Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 905 (2d Cir. 1993).

Nor have YMPJ and Project Citizenship manufactured standing by bringing this litigation. See Nnebe, 644 F.3d at 157 (discussing cases finding no standing where organization's injury was created for the purpose of bringing litigation). The organizations allocate additional resources to assist clients, including sending representatives to interviews, as a result of an alleged discriminatory and arbitrary policy of N-648 waiver denials. (Compl. ¶¶179−80, 186−87.) If they are successful in this lawsuit, they may obtain permanent declaratory relief instructing the agencies to review N-648 waivers in a fashion that will eliminate the additional resource burdens on the

organizations.  The organizations have shown that they have suffered an injury-in-fact that is traceable to the challenged action and redressable by a favorable decision.  Lujan, 504 U.S. at 560. Accordingly, YMPJ and Project Citizenship have Article III standing.

II.     The Complaint Fails to State a Claim Under the INA

Naturalization decisions by the USCIS pursuant to the INA are subject to "three avenues of judicial review."  Escaler v. U.S. Citizenship and Immigration Servs., 582 F.3d 288, 290−91 (2d Cir. 2009).  They are as follows:

> First, if an application for naturalization is not acted upon within 120 days of the naturalization examination, an applicant can seek a hearing in a district court, which may determine the application or remand it to the [US]CIS with instructions.  8 U.S.C. § 1447(b). Second, if an application is denied after completion of the available administrative review procedures, the applicant is able to seek review of the denial in a district court. 8 U.S.C. §1421(c). . . . Third, in extreme cases, mandamus relief may be available under [28] U.S.C. § 1361 for a failure to perform a clear, nondiscretionary duty.

Id. at 291.

Plaintiffs do not allege they would be able to obtain judicial review through mandamus or section 1447(b) in this circumstance, nor could they.  See 8 U.S.C. § 1447 (applying when USCIS fails to act); Heckler v. Ringer, 466 U.S. 602, 616−17 (1984) (stating 28 U.S.C. § 1361 applies only when plaintiffs have exhausted all other avenues of relief).  They have disavowed seeking relief pursuant to 8 U.S.C. § 1421(c) and acknowledge they have not exhausted administrative remedies required to obtain review under that subsection.  See Opp. Mem. to Mot. to Dismiss at 21 & n.20; Doc 52 (stating plaintiffs "do not need to exhaust administrative remedies" and "do not seek relief pursuant to 8 U.S.C. § 1421(c)"); see also 8 U.S.C. § 1421(c) (instructing persons whose naturalization application is denied to proceed to "a hearing before an immigration officer under section 1147(a) of this Title").

Instead, plaintiffs assert they may bring their INA claims pursuant to 8 U.S.C. § 1423(b)(1), which states that the requirements of passing the English and civics tests "shall not apply to any person who is unable because of physical or developmental disability or mental impairment to comply therewith." Plaintiffs contend that relief is not available through the INA's provisions for review because they are claiming systemic patterns of flawed decision-making in processing N-648 disability waivers that cannot be addressed at the level of the individual applicant under section 1421(c).

Plaintiffs rely on the Supreme Court's decision in <u>McNary v. Haitian Refugee Center</u>, 498 U.S. 479 (1991). In <u>McNary</u>, the Supreme Court held that a provision requiring exhaustion of administrative remedies and limited judicial review for individual determinations of immigrants' amnesty applications under the Immigration Reform and Control Act did not preclude pattern and practice challenges to the Immigration and Naturalization Service's ("INS") alleged unlawful practices. 498 U.S. at 484.[3]

The Court has considered the similarities between the statutory scheme under 8 U.S.C. § 1421 and that in <u>McNary</u>. The provision at issue here, 8 U.S.C. § 1421(c), refers to "[a] person whose application for naturalization" is denied "seek[ing] review of such denial." Like in <u>McNary</u>, the language of the review provision "refer[s] to a single act," that is, it "describe[s] the process of direct review of individuals denials . . . , rather than . . . general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." 498 U.S. at 492. And like in <u>McNary</u>, such language differs from other statutes which broaden the scope of review to explicitly encompass claims, like plaintiffs', that are styled as general pattern or practice

---

[3]The INS was dismantled and its functions are subsumed within USCIS. <u>See</u> Homeland Security Act of 2002 § 471, Pub. L. No. 107-296, 116 Stat. 2135, codified at 6 U.S.C. § 291.

claims.  See id. at 494 (enumerating examples of statutes that explicitly allow review of "all causes" and "all questions of law and fact").

But the similarities end there.  In McNary, the Supreme Court concluded that plaintiffs "would not as a practical matter be able to obtain meaningful judicial review" on statutory or Constitutional questions related to the agency's practices and procedures under the proscribed review procedure.  Id. at 496.  That was so because judicial review (i) was based on a limited administrative record; (ii) was based on an abuse of discretion standard of review; (iii) would only occur upon apprehension or voluntary surrender of an alien for deportation proceedings, a price "tantamount to a complete denial of judicial review for most undocumented aliens"; and (iv) occurred in the first instance at a federal court of appeals, which was "the practical equivalent of a total denial of judicial review of generic constitutional and statutory claims" because courts of appeals lacked "factfinding and record-developing capabilities of a federal district court."  Id. at 496, 497; see id. at 493−94; Abdullah v. INS, 184 F.3d 158, 163 (2d Cir. 1999) (summarizing McNary).  Because of this inability to obtain meaningful review, plaintiffs could bring their claims directly to a district court without exhausting administrative remedies under the statutory scheme.

The statutory scheme enacted by Congress under 8 U.S.C. § 1421(c) contains none of the pitfalls that deprive an aggrieved individual of "meaningful judicial review."  McNary, 498 U.S. at 496; see Elgin v. Dep't of Treasury, 567 U.S. 1, 21 n.11 (2012) (distinguishing McNary where the challenged statute's "review process is not similarly limited"); Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 14 (2000) (distinguishing McNary because it "turned on the different language of that different statute").  Review of denials of N-648 waivers as part of the larger review of denials of naturalization applications proceeds following a hearing with an

immigration officer directly to a "United States district court for the district in which such person resides." 8 U.S.C. § 1421(c); see 8 C.F.R. § 336.9(d). The district court is required to engage in a "de novo" review and is instructed to "make its own findings of fact and conclusions of law." 8 U.S.C. § 1421(c). It further has the power to, "at the request of the petitioner, conduct a hearing de novo on the application." Id. Such hearings may include discovery and deposition practice. See, e.g., Lawson v. United States Citizenship and Immigration Servs., 795 F. Supp. 2d 283, 293 (S.D.N.Y. 2011). A denial of an individual's claims at the district court is appealable as of right to a United States Court of Appeals. See 28 U.S.C. § 1291.

The violations plaintiffs allege such as arbitrary decision-making, discrimination on the basis of disability, due process violations, and failure to provide adequate notice of denial, see Compl. ¶2, may be remedied in individualized proceedings in the district court, see 8 U.S.C. § 1421(c) (permitting review "in accordance with chapter 7 of title 5 [the APA]"); 5 U.S.C. § 706 ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

A naturalization proceeding is also fundamentally different from a removal proceeding. If a naturalization application is denied by a hearing officer, LPRs are not threatened with removal or required to voluntarily surrender to immigration authorities to obtain judicial review. They maintain permanent resident status, and again may apply for naturalization. (Compl. ¶42.)

For the two individual plaintiffs who continue to have N-648 waivers denied, meaningful review is available pursuant to section 1421(c) so long as they exhaust statutory

remedies, which they admit they have not done.[4]  The two remaining individual plaintiffs with

outstanding N-648 waiver denials, Moya and Ruiz, had their naturalization applications denied in

June and September 2017, respectively.  (Compl. ¶¶97, 128.)  They had thirty days to request a

hearing on the denial of their naturalization applications before USCIS.  8 C.F.R. § 336.2(a); see

8 U.S.C. § 1421(c).  Moya and Ruiz had not exhausted their remedies by the time the Complaint

was filed in December 2017.  (Doc 1.)

Section 1421(c)'s "grant of authority is unusual in its scope—rarely does a district

court review an agency decision de novo and make its own findings of fact."  Nagahi v. INS, 219

F.3d 1166, 1169 (10th Cir. 2000).  And while there is a "strong presumption that Congress intends

review of administrative action," Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667,

670 (1986), "[a]dministrative exhaustion requirements, which are commonplace, do not conflict

with th[is] strong presumption," Theodoropoulos v. INS, 358 F.3d 162, 171 (2d Cir. 2004)

(internal quotation marks omitted).  "Exhaustion of administrative remedies serves numerous

purposes," such as "protecting the authority of administrative agencies, limiting interference in

agency affairs, and promoting judicial efficiency by resolving potential issues and developing the

factual record."  Beharry v. Ashcroft, 329 F.3d 51, 56 (2d Cir. 2003).  "Having chosen not to

pursue available administrative review, [plaintiffs are] hardly in a position to claim that such

review denied [them] due process."  Aronson v. Hall, 707 F.2d 693, 694 (2d Cir. 1983).

Statutory exhaustion requirements in this circuit "are mandatory, and courts are not

free to dispense with them."  Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 94 (2d Cir. 1998); see

Theodoropoulos, 358 F.3d at 172 ("[A]s a general rule, courts are required to strictly enforce

---

[4] The remaining seven plaintiffs who have had their N-648 waivers approved no longer have "any actual controversy about the plaintiffs' particular legal rights," only "an abstract dispute about the law," and their claims are moot. Alvarez v. Smith, 558 U.S. 87, 93 (2009).

statutory exhaustion requirements." (first citing <u>Booth v. Churner</u>, 532 U.S. 731, 741 n.6 (2001), then citing <u>McCarthy v. Madigan</u>, 503 U.S. 140, 144 (1992)). "If a party fails to exhaust administrative remedies, then the court may dismiss the action because subject matter jurisdiction does not exist." <u>Bastek</u>, 145 F.3d at 94; <u>see</u> <u>U.S. ex rel. The Saint Regis Mohawk Tribe v. President R.C.—St. Regis Mgmt. Co.</u>, 451 F.3d 44, 50 (2d Cir. 2006) (similar). <u>But see</u> <u>Shweika v. Dep't of Homeland Sec.</u>, 723 F.3d 710, 719 (6th Cir. 2013); <u>Eche v. Holder</u>, 694 F.3d 1026, 1028 (9th Cir. 2012) (holding section 1421(c)'s exhaustion requirement is non-jurisdictional).

   The individual plaintiffs urge that administrative exhaustion requirements may be dispensed with because enforcement of section 1423(b) need not be accomplished through the judicial review provision under section 1421(c). But the individual plaintiffs have not persuaded this Court to infer a separate right of action under 8 U.S.C. § 1423(b). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) (internal quotation marks omitted); <u>cf.</u> <u>Aparicio v. Blakeway</u>, 302 F.3d 437, 448 (5th Cir. 2002) (holding that "appellants may not take the <u>McNary</u> escape route" for claims challenging a general INS practice "because section 1421 provides an adequate review for their challenge"). Whether USCIS engaged in unconstitutional practices in deciding N-648 waiver requests "would [not] have been irrelevant in the processing of a particular individual application." <u>McNary</u>, 498 U.S. at 497. Plaintiffs may challenge the allegedly discriminatory ways in which USCIS officers adjudicate N-648 waivers on an individual basis and, should the type of adjudication or practices used be held unconstitutional or otherwise unlawful, that conclusion may be cited by other individuals in future naturalization applications. Concerns about the availability of judicial review that have prompted courts to interpret statutes

not to foreclose additional avenues of review are therefore diminished.  See, e.g., Shalala, 529 U.S. at 23−24 (concluding plaintiffs could not circumvent statutory review where they could "contest in court the lawfulness of any regulation or statute upon which an agency determination depends," even where such claims could not be asserted in the agency proceeding); Theodoropoulos, 358 F.3d at 172 ("[A]lthough a constitutional attack upon a statute need not be raised before [an] agency, a constitutional attack upon an agency's interpretation of a statute is subject to the exhaustion requirement." (internal quotation marks omitted)).[5]

For the organizational plaintiffs, INA review is also foreclosed.  Organizational plaintiffs are not "person[s] whose application for naturalization" has been denied, 8 U.S.C. § 1421(c), and they are not claiming to be representatives solely of individual plaintiffs' interests so that the "special review channel" would "adequately protect [their] rights," Shalala, 529 U.S. at 24.  The organizations do not have a viable claim for relief under the INA.  Their claims, if cognizable, must be reviewed according to the provisions of the APA or the Constitution.

III.    Individual Plaintiffs' APA and Constitutional Claims are Foreclosed by the Denial of Their INA Claims

Plaintiffs bring a claim for violation of the APA, 5 U.S.C. § 701 et seq., based on the same alleged unlawful failure to implement a fair process for considering N-648 waiver applications as that underlying their INA claims.  Compare Compl. ¶¶209−212 (APA claim), with Compl. ¶191 (INA claim).  The APA generally provides a waiver of the United States' sovereign immunity for suits seeking relief other than monetary damages brought by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within

---

[5] Plaintiffs also rely on Campos v. Immigration and Naturalization Service, 32 F. Supp. 2d 1337 (S.D. Fla. 1998).  In Campos, the district court held that LPRs were not required to exhaust administrative remedies to bring suit in federal court challenging INS determinations of medical waivers under the INA, APA, Freedom of Information Act, and the Constitution.  32 F. Supp. 2d at 1341, 1348.  The Court is not persuaded by this non-binding, out-of-circuit authority.

the meaning of the relevant statute." 5 U.S.C. § 702; see Bowen, 487 U.S. at 891−92. "There are . . . many threshold limitations to judicial review under the APA." Sharkey v. Quarantillo, 541 F.3d 75, 84 (2d Cir. 2008). The APA only provides for judicial review of actions that are reviewable by statute or any "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

Ruiz and Moya are barred from bringing their APA claims. To the extent they seek to bring claims for final agency action for which there is no other adequate remedy, they have disavowed that they are seeking review of a final agency action. See Pls.' Opp. to Defs.' Mot. to Dismiss at 18; Doc 52 ("Plaintiffs do not seek review of final agency decisions . . . ."). And as discussed above, see supra Section II, there is another "adequate remedy" through the review process explicitly granted by the INA. All relief that individual plaintiffs seek may be granted under section 1421(c). See 8 U.S.C. § 1421(c) (authorizing review "in accordance with chapter 7 of title 5 [the APA]"). Congress did not intend APA review "to duplicate existing procedures for review of agency action." Bowen, 487 U.S. at 903; see Escaler, 582 F.3d at 291 n.1 ("Nor have we been informed as to what judicial relief the APA might authorize that adds to the sweeping de novo review provided by Section 1421(c)."). And "the exhaustion doctrine continues to exist under the APA to the extent that it is required by statute . . . ." Darby v. Cisneros, 509 U.S. 137, 153 (1993); see Sharkey, 541 F.3d at 90; Baez-Fernandez v. INS, 385 F. Supp. 2d 292, 295 (S.D.N.Y. 2005) ("[The APA] does not apply to the conduct of hearings explicitly governed by the INA.").

Ruiz and Moya also may not circumvent section 1421(c) and assert direct constitutional claims for violations of procedural due process based on the manner in which USCIS grants N-648 waivers. See Compl. ¶¶213−17. "[T]he presence of constitutional issues alone does

not create an automatic exception to the exhaustion requirement." <u>Able v. United States</u>, 88 F.3d 1280, 1288 (2d Cir. 1996); <u>see id.</u> (listing certain instances during which "exhaustion may not be required"). The Supreme Court has signaled that where Congress has enacted a legislative scheme that permits meaningful judicial review of Constitutional questions, challenges to the administration of those provisions should be addressed through the avenues provided. <u>Thunder Basin Coal Co. v. Reich</u>, 510 U.S. 200, 215 (1994); <u>see</u> <u>Theodoropoulos</u>, 358 F.3d at 172 (similar). Individual plaintiffs should not be permitted to bypass the legislative scheme designed to adjudicate and review questions related to their naturalization applications. Accordingly, they many not bring independent Constitutional claims that could have been brought under section 1421(c).

IV.    Organizational Plaintiffs Do Not Fall Within the Zone-of-Interests of the INA

The question of the organizational plaintiffs' Article III standing does not resolve whether they are within the zone of interests that the INA was designed to protect. The Court concludes that they are not.

The "classic" test is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." <u>Bennett v. Spear</u>, 520 U.S. 154, 175 (1997) (internal quotation marks omitted). "The APA confers a general cause of action upon persons adversely affected or aggrieved by agency action within the meaning of a relevant statute," here, the INA. <u>Block v. Cmty. Nutrition Inst.</u>, 467 U.S. 340, 345 (1984) (internal quotation marks omitted); <u>see</u> <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. 209, 225 (2012) (discussing "Congress's evident intent when enacting the APA to make agency action presumptively reviewable" (internal quotation marks and citation omitted)). In the context of the APA, the zone

of interests requirement is not "especially demanding" and will foreclose suit "only when a plaintiff's interests are so marginally related . . . that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." Lexmark, 572 U.S. at 130 (internal quotation marks and citation omitted). Because organizational plaintiffs' Fifth Amendment due process claim expressly incorporates the alleged APA violations and relates to the same due process guarantees, Compl. ¶213, the Court considers the Constitutional claims here as well.

Organizational plaintiffs claim that their interest sought to be protected is "representing their clients in naturalization proceedings that are conducted lawfully." Opp. Mem. at 11; Doc 52; see Compl. ¶¶ 179−80, 187 (referring to organizations' "clients"). However, they do not point to any provisions of the INA or its legislative history which indicate that Congress intended to protect the interests of advocacy groups representing clients at immigration hearings. And such an intent to protect advocacy groups "does not appear so plausible from the statute itself that [the Court] will infer it without more." Fed'n for Am. Immigration Reform, Inc. v. Reno, 93 F.3d 897, 901 (D.C. Cir. 1996) (discussing interest group's failure to come within the INA's zone of interest). As discussed above, 8 U.S.C. § 1423(b) is directed to "person[s]" who are "filing . . . [an] application for naturalization," and 8 U.S.C. § 1421(c), discussing judicial review under the subchapter, provides review only for "[a] person whose application for naturalization under this subchapter is denied." Section 1422, Eligibility for naturalization, discusses only "[t]he right of a person to become a naturalized citizen." It does not mention rights or intent with respect to ancillary individuals or organizations involved in preparing individuals for the naturalization process.

Plaintiffs cite to the recent case of Batalla Vidal v. Nielsen, in which a district court found that an immigrant rights organization and States were within the INA's zone of interests.

291 F. Supp. 3d 260, 269 n.3 (E.D.N.Y. 2018). Batalla Vidal is distinguishable. In Batalla Vidal, the individual plaintiffs whose immigration status was affected by the INA were not only clients of the organizational plaintiff, they were also either employees or members of the organization and employees of the State plaintiffs. Id. at 269 n.3 ("At the very least, the State Plaintiffs employ a number of DACA recipients."). The district court in Batalla Vidal cited to Regents of the University of California v. United States Department of Homeland Security for support. In that case, another district court determined employers of immigrants were within the INA's zone of interests and detailed which specific provisions of the INA discuss employer interests. 279 F. Supp. 3d 1011, 1036 (N.D. Cal. 2018), aff'd, 908 F.3d 476 (9th Cir. 2018). Batalla Vidal does not stand for the sweeping proposition that any organization with immigrant clients has standing to sue for violations of the INA.

Other courts to consider the issue of whether organizational plaintiffs come within the INA's zone of interests have made similar affirmative determinations based on an organization's membership or employees or a State's interest in employment of individuals affected by the INA. See, e.g., Hawaii v. Trump, 859 F.3d 741, 766 (9th Cir. 2017), vacated on other grounds by Trump v. Hawaii, 138 S. Ct. 377 (2017); NAACP v. Trump; 298 F. Supp. 3d 209, 235 (D.D.C. 2018). By contrast, advocacy organizations with rights allegedly affected by actions related to their clients' immigration status have not been found to fall within the INA's zone of interests. Haitian Refugee Ctr. v. Gracey, 809 F.2d 794, 815 (D.C. Cir. 1987); N.W. Immigrant Rights Project v. United States Citizenship and Immigration Servs., 325 F.R.D. 671, 687−88 (W.D. Wash. 2016) (organizational plaintiffs with immigrant clients not within the zone of interest). In the limited circumstances in which district courts determined organizations advocating for clients fell within the INA's zone of interest, the provisions of the INA at issue did

not concern naturalization.  See Al Otro Lado, Inc. v. Nielsen, 327 F. Supp. 3d 1284, 1301 & n.7 (S.D. Cal. 2018) (organization with asylum applicants as clients falls within the INA's zone of interest); Doe v. Trump, 288 F. Supp. 3d 1045, 1061−62, 1067−68 (W.D. Wash. 2017) (organizations with refugees as clients fall within the INA's zone of interests).

Project Citizenship and YMPJ allege that the challenged practices impede their clients' due process rights in N-648 waiver determinations, and that this injustice in turn harms the organizational plaintiffs.  See, e.g., Compl. ¶¶210−12 (describing under the APA cause of action purported failures to provide adequate due process with respect to "applicants"), 216−17 (describing under the Fifth Amendment cause of action how N-648 waiver denials of "the clients of the Organizational Plaintiffs deprives the . . . applicants of due process").  But this purported due process harm to the organizations is "derivative," and the Second Circuit has said that where organizational plaintiffs "do not assert a harm to their own interest in receiving due process of law, this is precisely the sort of claim that the prudential standing doctrine is designed to foreclose." Ctr. for Reprod. Law and Policy v. Bush, 304 F.3d 183, 196 (2d Cir. 2002) (Sotomayor, J.) (dismissing Constitutional claim).[6]  This, along with plaintiffs' failure to point to any language in the INA or its legislative history suggesting Congressional intent for advocacy organization standing, ends the Court's inquiry.  While organizational plaintiffs "may well have an injury-in-fact cognizable under Article III," they "cannot invoke the protection of" the APA or Fifth Amendment based on alleged unlawful interpretations of the INA.  Lexmark, 572 U.S. at 132. Accordingly, even though the zone of interests inquiry is not demanding, the Court concludes that organizational plaintiffs' interests are "so marginally related" to the purposes of the INA that

---

[6] While the zone of interests test used to be classified under the header of 'prudential standing,' the Supreme Court has since "found that label inapt."  Lexmark, 572 U.S. at 128 n.3.

organizational plaintiffs do not have a cause of action under the APA or under the Constitution.

Id. at 130.

<blockquote>

V. The Rehabilitation Act Does Not Provide a Private Cause of Action to Support Plaintiffs' Claims
</blockquote>

Plaintiffs allege violations of the Rehabilitation Act, 29 U.S.C. § 701 et seq.  (See

Compl. ¶¶193−206.)  Section 504 of the Rehabilitation Act provides in relevant part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . .

29 U.S.C. § 794(a).

29 U.S.C. § 794a(a)(2) grants an express private right of action to "any person

aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of

such assistance under section 794 of this title."  The Supreme Court has held that these provisions

waive the Government's sovereign immunity for monetary damages only with respect to suits

against a federal agency acting as a "Federal provider" of financial assistance.  Lane v. Pena, 518

U.S. 187, 193 (1996).

Neither the Supreme Court nor the Second Circuit have ruled on whether the

Rehabilitation Act provides an implied private right of action for individuals or organizations to

sue for injunctive or declaratory relief to enforce the provisions of § 794(a) banning disability

discrimination "conducted by any Executive agency."[7]  Courts that have considered the issue have

reached conflicting results.  Compare Clark v. Skinner, 937 F.2d 123, 126 (4th Cir. 1991); Cousins

---

[7] The lower court in Lane had granted injunctive relief as a remedy for unlawful actions of an Executive agency that was not a Federal provider of assistance or a recipient of such assistance.  See 518 U.S. at 189.  The Supreme Court did not discuss the lower court's grant of injunctive relief except to say that the Government did not contest it.  Id. at 196−97.

v. Sec'y of the Dep't of Transp., 880 F.2d 603, 605−07 (1st Cir. 1989) (en banc) (Breyer, J.); SAI v. Dep't of Homeland Sec., 149 F. Supp. 3d 99, 112 (D.D.C. 2015) (no implied private right), with McRaniels v. United States Dep't of Veterans Affairs, 15 cv 802 (WMC), 2017 WL 2259622, at *4 (W.D. Wis. May 19, 2017); Am. Council of Blind v. Astrue, 05 cv 4696 (WHA), 2008 WL 1858929, at *7 (N.D. Cal. Apr. 23, 2008); Am. Council of Blind v. Paulson, 463 F. Supp. 2d 51, 57–58 (D.D.C. 2006) (implied private right), and Cooke v. United States Bureau of Prisons, 926 F. Supp. 2d 720, 731−32 (E.D.N.C. 2013) (surveying and ultimately declining to reach the issue). Courts in this district have consistently found that the Rehabilitation Act does not provide an independent cause of action for injunctive or declaratory relief against any Executive agency. Doe v. U.S. Sec'y of Transp., 17 cv 7868 (CS), 2018 WL 6411277, at *14 (S.D.N.Y. Dec. 4, 2018) (Siebel, J.); Pereira v. U.S. Dep't of Justice, 16 cv 2599 (NRB), 2016 WL 2745850, at *19 (S.D.N.Y. May 11, 2016) (Buchwald, J.); Kinneary v. City of New York, 358 F. Supp. 2d 356, 360 (S.D.N.Y. 2005) (Marrero, J.).

Plaintiffs ask the Court to infer a private right of action under section 794(a). "[P]rivate rights of action to enforce federal law must be created by Congress." Alexander v. Sandoval, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy," and "[s]tatutory intent . . . is determinative." Id. "To discern Congress's intent, [the Court] look[s] first to the text and structure of the statute." Republic of Iraq v. ABB AG, 768 F.3d 145, 170 (2d Cir. 2014) (internal quotation marks and citation omitted). It also considers the factors enumerated in Cort v. Ash, 422 U.S. 66 (1975), which ask: (1) if the plaintiff is "one of the class for whose especial benefit the statute was enacted"; (2) if there is any indication of legislative

- 21 -

intent, explicit or implicit, to create or deny such a remedy; and (3) if implying a remedy is "consistent with the underlying purposes of the legislative scheme." Id. at 78.

The Rehabilitation Act does not provide plaintiffs with a private cause of action. The Court begins with the language of the statute. Sandoval, 532 U.S. at 288. The statute does not provide an express private right of action against any Executive agency. Where there is no express private right, courts "begin with the presumption that Congress did not intend one." Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 116 (2d Cir. 2007). Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), states that remedies shall be available to "any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance . . . ." It does not track the rights-language of the statute, which prohibits discrimination more broadly by "any Executive agency." 29 U.S.C. § 794(a). By contrast, in the other remedies provision, section 505(a)(1), 29 U.S.C. § 794a(a)(1), Congress provides an explicit cause of action by "any employee or applicant for employment aggrieved by the final disposition of [a] complaint, or by the failure to take final action on [a] complaint" made under section 791, regardless of the kind of Government actor who performed the grievance.

The Supreme Court, in addressing whether section 505(a)(2) provides a private right of action for monetary damages, stated: "Section 505(a)(1)'s broad language . . . suggests by comparison with [section] 505(a)(2) that Congress did not intend to treat all [section] 504(a) defendants alike with regard to remedies." Lane, 518 U.S. at 193. It has further expressed "reluctance" to infer private rights of action "when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." Jama v. Immigration & Customs Enf't, 543 U.S. 335, 341 (2005). Accord Russello, 464 U.S. at 23.

Section 505(b) does not suggest a different outcome. That section grants prevailing parties attorney fees "[i]n any action or proceeding to enforce or charge a violation of a provision of this subchapter." 29 U.S.C. § 794a(b). It was added to the Rehabilitation Act by amendment along with section 504(2)'s language that all disabled individuals have the right to be free from discrimination "under any program or activity conducted by any Executive agency." See Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. 95-602, §§ 119, 120(a), 92 Stat. 2955, 2982. The statutory allowance for attorney fees by itself cannot be read to grant an implied private right of action for injunctive or declaratory relief under section 504(2). See Cousins, 880 F.2d at 607. Congress knows how to draft broad provisions when it aims to do so and is otherwise intentional in its language. Ziglar v. Abbasi, 137 S. Ct. 1843, 1856 (2017) ("It is logical . . . to assume that Congress will be explicit if it intends to create a private cause of action."). By adding a broad attorney fees provision and broadening the rights-granting language under section 504 but not amending the remedies-granting language of section 505, Congress may be understood to have made a deliberate choice to maintain a limited cause of action to enforce section 504. See Pereira, 2016 WL 2745850, at *19.

Consideration of the Cort factors also does not change this outcome. Individual plaintiffs, unlike organizational plaintiffs, may be of the class for whose benefit the statute was enacted. See 29 U.S.C. § 701(b)(1) (stating as a "purpose of this chapter" "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society"). That said, there is strong indication that Congress did not intend for a private remedy to accompany the right to be free from discrimination from any Executive agency, as explained above. It is inconsistent with the underlying purpose of the legislative scheme to imply such a remedy here, where individual plaintiffs may bring their claims under the INA "in

accordance with chapter 7 of title 5." 8 U.S.C. § 1421(c); see SAI, 149 F. Supp. 3d at 113 ("[I]t is easy to imagine why Congress would not have created a private cause of action to enforce Section 504 against federal agencies: it knew that review would be available under the APA."); Kinneary, 358 F. Supp. 2d at 360 ("There does not appear to be a compelling reason for this Court to muddy the waters of judicial review of agency action under the APA by implying a parallel private right of action under the Rehabilitation Act.").[8]

CONCLUSION

   Defendants' motion to dismiss the Complaint is GRANTED. The Clerk is directed to terminate the motions (Docs 46, 56). The Court previously set a briefing schedule on certain new claims plaintiffs wish to assert in an amended complaint and injunctive relief on the new claims. The motions may proceed on the existing schedule with, of course, the right to address whether any amended claim would be futile in view of the holdings herein.

   SO ORDERED.

_P. Kevin Castel_
P. Kevin Castel
United States District Judge

Dated: New York, New York
   February 15, 2019

---

[8] DHS, in promulgating "such regulations as may be necessary to carry out" section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), developed an administrative review scheme for claims over which it has jurisdiction that is consistent with the use of the APA to review discrimination claims. "Any person who believes that he or she has been subjected to discrimination prohibited by [section 504] may . . . file a complaint" with DHS's Officer for Civil Rights and Civil Liberties, and the Department shall issue the results of an investigation which is subject to appeal. 6 C.F.R. § 15.70(d)-(g). The determination on appeal becomes a "final agency decision" subject to APA review. Id. § 15.70(i). Plaintiffs have not filed any complaints with the DHS's Officer for Civil Rights and Civil Liberties. See Opp. Mem. to Mot. to Dismiss at 20; Doc 52.